

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Marriage of | ) | No. 72147-0-I |
| CHRISTOPHER JAMES BURROWS, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | UNPUBLISHED OPINION |
| and | ) | |
| | ) | |
| ALICIA ANN DEGON, | ) | |
| | ) | |
| Appellant. | ) | FILED: February 16, 2016 |

SCHINDLER, J. — Alicia Ann DeGon appeals the decree of dissolution, the amended findings of fact and conclusions of law, the final parenting plan, and the order of child support. DeGon contends the court erred by (1) imposing restrictions under RCW 26.09.191(3) and designating Christopher Burrows as the residential parent with sole decision-making authority, (2) entering a restraining order that prohibits her from having contact with Burrows and denying her motion for reconsideration or to reopen to present additional evidence or for a new trial, (3) imputing income for the purpose of calculating child support, and (4) awarding spousal maintenance to Burrows. DeGon also challenges the division of property and payment of expert witness fees and other costs. We affirm in all respects.

FACTS

Christopher James Burrows is a British citizen. In 1980, he graduated from Cambridge University with a PhD in high energy physics. In 1984, Dr. Burrows started working for the European Space Agency in Baltimore, Maryland. Dr. Burrows, his spouse, and their three children lived in Maryland. After Dr. Burrows and his spouse separated, she returned to England with the children.

In 1998, Dr. Burrows met Alicia Ann DeGon online. DeGon has a master's degree in business administration.

In 2000, Dr. Burrows resigned from the European Space Agency after suffering "major depression" caused by the end of his marriage. Dr. Burrows and DeGon started dating in 2000.

Dr. Burrows and DeGon were married on April 14, 2001. Approximately one month before, they purchased a single-family home in Edmonds. Each of them contributed separate funds for the down payment but agreed to put the title to the property in only DeGon's name.

In February 2002, DeGon gave birth to J.B. In 2002, Dr. Burrows began working for the NASA[1] Jet Propulsion Laboratory and DeGon started a recruiting business. In May 2003, DeGon gave birth to S.B. Dr. Burrows' work at the Jet Propulsion Laboratory ended in 2005.

In the summer of 2005, Dr. Burrows developed a software program for the recruiting business, "AgileRecruiter." AgileRecruiter contained a database of approximately 60,000 candidates and a search engine that identified potential

---

[1] United States National Aeronautics and Space Administration.

candidates to fill particular job positions. In 2006, Dr. Burrows and DeGon incorporated the business as MetaJiva Corporation. MetaJiva focused on executive-level recruiting for public and private companies. In February 2006, DeGon gave birth to I.B.

In 2007, DeGon and Dr. Burrows sold MetaJiva and the AgileRecruiter software program to Solutions IQ for $3 million. Solutions IQ hired DeGon as a vice president and hired Dr. Burrows to maintain the AgileRecruiter software. In late 2008, the agreement with Solutions IQ "fell apart." In late 2010, DeGon and Dr. Burrows entered into a settlement agreement with Solutions IQ. As part of the settlement agreement, Dr. Burrows and DeGon received $525,000 and the AgileRecruiter software program.

In 2009, Dr. Burrows began working as a contractor for NASA reviewing proposed projects. Dr. Burrows performed approximately one review per year. Dr. Burrows was able to do the "vast majority" of the review work at home.

In 2010, DeGon began working as a consultant at Intellectual Ventures in Issaquah. DeGon earned approximately $15,000 to $20,000 per month. Beginning in August 2010, DeGon started staying with a friend in Belltown. DeGon stayed with her friend for the next "six or seven months."

When DeGon "returned to the family home" in 2011, she was working "very long hours" at Intellectual Ventures. In October 2011, DeGon left her job at Intellectual Ventures. On December 14, DeGon executed a quitclaim deed transferring "all right, title, and interest" in the Edmonds residence to "Dr. Christopher Burrows [and] Alicia DeGon."

3

In March 2012, Dr. Burrows started taking antidepressants and "went back into therapy." The therapist recommended a "trial separation" from DeGon. On June 4, Dr. Burrows traveled to England to visit his family.

On June 25, 2012, DeGon filed a petition for a domestic violence protection order against Dr. Burrows. On July 23, Dr. Burrows filed a petition for dissolution of the marriage. On August 9, a superior court commissioner dismissed the petition for a domestic violence protection order against Dr. Burrows. The court appointed a guardian ad litem (GAL) and ordered Dr. Burrows and DeGon to each "undergo a CR 35 examination with a psychologist (PhD) or psychiatrist." On August 13, the court entered a temporary restraining order prohibiting Dr. Burrows and DeGon from "disturbing the peace of the other party or of any child."

Licensed clinical psychologist Dr. Roland Maiuro conducted the CR 35 examinations. On November 1, 2013, Dr. Maiuro issued a 25-page report. The report included extensive findings and recommendations. Dr. Maiuro states Dr. Burrows has "an established history of major mental illness." Dr. Maiuro states Dr. Burrows was vulnerable "due to his mental illness, dependency, and desire to please [DeGon]."

Dr. Maiuro concluded DeGon was aware of Dr. Burrows' "vulnerabilities" and engaged in abusive behavior toward him.

> There is evidence that Ms. DeGon was aware of these characteristics and vulnerabilities, but nonetheless pushed the limits on sexual freedom, experimentation to a degrading and punitive level. It is these special circumstances that made the behavior abusive in quality.

Dr. Maiuro also concluded:

> Mr. Burrows . . . has been . . . traumatized by the type of degrading and potentially health endangering sexual experiences that he claims he

4

participated in, both consentually [sic] and then for a limited time reportedly near the end of the relationship, nonconsentually [sic].

Dr. Maiuro diagnosed DeGon as having "Histrionic and Narcissistic Personality (Axis II) features that affect her perception of events, emotional reactivity, and reporting style." Dr. Maiuro concluded DeGon "is likely to have engaged in acts of psychological and emotional abuse that have been hurtful to others." Based on diagnostic testing, the report states that DeGon falls within a range of individuals who "may attempt to dominate, browbeat or control others" and whose "emotions and personal needs can interfere with their judgment, resulting in a violation of personal boundaries and unhealthy behavior on their part."

On November 9, 2012, the GAL issued a 25-page report. The GAL report states the children "all have educational and behavioral problems." J.B. "has a lot of bottled up anger" and S.B. "appears to have psychological problems" and "a significant reading disability" that needs to be addressed. The GAL believed I.B. "may have some delays as well."

The GAL concluded the "father's mental health, the parents' separation, and the ongoing conflict between the parents are undoubtedly affecting the children's ability to be successful in the world outside of home, in their education, and with their peers." The GAL recommended regular therapy for J.B. "should immediately be scheduled and attended" and that S.B. and I.B. "should be evaluated . . . to determine [the] need for therapy."

The GAL states that although Dr. Burrows had "a significant episode of depression," he now "seems to be relatively stable, is in treatment, and has insight into his illness." The GAL reported Dr. Burrows and DeGon had "some problems" with the

exchange of the children. The GAL recommended the children "reside with the mother and spend every weekend with their father from after school . . . on Friday until Sunday at 6:00 p.m."

On January 8, 2014, the GAL issued a 14-page supplemental report. The supplemental report states that "[b]oth parents have taken part in abusive use of conflict" and describes "extreme conflict between the parents," including "conflicts over exchanges, over phone calls, over property, over finances to name a few." The GAL states the children "are in the middle of and are exposed . . . frequently" to the conflict between Dr. Burrows and DeGon. The GAL recommended Dr. Burrows and DeGon "engage in counseling and address issues raised by Dr. Maiuro's report."

The GAL recommended the children reside with DeGon from Sunday evening until Thursday after school and reside with Dr. Burrows from Thursday after school until Sunday evening, and "[t]here should be no contact between the parents at exchanges." The GAL recommended the court make Dr. Burrows "responsible for the children's mental health needs because the mother has not followed through" and "seems to have limited insight into [the children's] needs." The GAL states that DeGon's "failure to engage [the] children in regular counseling despite significant problems, numerous recommendations, and her repeated promises to do so has further damaged the children, and it is compounded by her belief that the children are fine."

The dissolution trial began on May 12, 2014. The parties disputed the parenting plan, maintenance, division of assets, and liabilities. A number of witnesses testified during the seven-day trial including Dr. Burrows, DeGon, the GAL, and Dr. Maiuro. The

6

court admitted into evidence over 100 exhibits including the GAL reports and Dr. Maiuro's report.

Dr. Burrows testified that he is "a high functioning depressive," recognizes when he needs to obtain treatment, and does "what needs to be done even if I am depressed." Dr. Burrows testified that his ability to conduct NASA reviews in the future is "somewhat in question" because he had a "breakdown" and "basically disappeared from the committee." Dr. Burrows testified that DeGon abused him during the marriage.

The GAL testified that all three children have mental health issues. The GAL said J.B. has behavioral issues, lacks social skills, and needs speech therapy. The GAL said J.B.'s pediatrician was concerned about J.B. and believed he should be evaluated for autism. The GAL testified that S.B.'s pediatrician diagnosed him with "[a]djustment disorder with anxiety" and a "[d]epressive disorder." The GAL said S.B. has a "visual processing deficit" and his reading skills are "way below grade level." The GAL described when S.B. "was prepared to knife himself" but J.B. stopped him. The GAL believed I.B. was "a little bit below grade level" in reading "but it is not significant like her brothers."

The GAL stated Dr. Burrows is "stable and able to parent as long as he is medicated" and recommended the court make Dr. Burrows responsible for obtaining mental health treatment for the children. The GAL testified that DeGon neglected the children's mental health issues and "had not followed through in the past when the children needed therapy." The GAL said DeGon takes the children to therapy only "when there is a crisis."

Dr. Maiuro testified about the CR 35 examinations. Dr. Maiuro said, "I don't know that I have ever conducted an evaluation that has been this lengthy in process or required as much time to conduct and to come up with [what] I felt were reliable opinions that I could be confident in."

DeGon testified that when Dr. Burrows is not having mental health issues, he is "a fabulous father." According to DeGon, Dr. Burrows and J.B. get "along really well with some exceptions," and Dr. Burrows has a "warm and wonderful" relationship with S.B. and I.B. DeGon said she stayed at her friend's home in Belltown for six months during 2010 because it was closer to her job in Issaquah. DeGon testified she began working at Kaman Engineering Services in April 2014 with a starting salary of $90,000 per year. DeGon did not address the testimony that she abused Dr. Burrows.

On July 2, the court entered written findings of fact and conclusions of law and a decree of dissolution, parenting plan, child support order, and restraining order prohibiting DeGon from having any contact with Dr. Burrows except through the case manager.

The court found the evidence justified parenting plan restrictions under RCW 26.09.191(3) because:

> Both parties' involvement or conduct may have an adverse effect on the children's best interests because of the existence of the factors which follow:
>
> (1)      The abusive use of conflict by Both Parties;
> (2)      Episodes of child neglect by the Mother;
> (3)      Denying a parent access to the children by the Mother;
> (4)      Acts constituting domestic violence by the Mother; and
> (5)      Derogatory statements by the Father about the Mother that could lead to the alienation of affection.

The court based its conclusion that DeGon "has a pattern of child neglect" primarily on the evidence that DeGon refused to seek mental health treatment for the children and "abandoned" them for a period of six months in 2010. The court also found that following their separation, DeGon "intentionally cut off Dr. Burrows from having contact with the children" and "continues to use access to the children as a bargaining chip at best, and at worst, as a means of controlling Dr. Burrows."

The court found that "there is no evidence in the record" to support DeGon's allegations that Dr. Burrows can become violent when angry. The court found the parties engaged in sex "that went too far, and to which Dr. Burrows did not consent." The court found that DeGon "engaged in repeated behaviors that appear to have been directly designed to push Dr. Burrows past the breaking point."

The court found that although Dr. Burrows and DeGon "each suffer from mental health challenges," "[i]t is uncontroverted that each parent is highly intelligent, highly educated and loves their children."

The court designated Dr. Burrows as the residential parent with sole decision-making authority and gave DeGon residential time with the children every other weekend from Thursday after school until Monday morning. The court found that Dr. Burrows' "symptoms are treatable" and that Dr. Burrows "is clearly capable of parenting his children."

The court concluded the Edmonds residence was community property and awarded the house and a $50,000 home equity loan to Dr. Burrows. The court valued the AgileRecruiter software and database at $80,000. The court awarded DeGon an equalizing payment of $75,000. The court ruled Dr. Burrows was not required to

reimburse DeGon for his share of the health insurance premiums DeGon paid during the separation.

The court found Dr. Burrows "has the need for maintenances and [DeGon] has the ability to pay" and ordered DeGon to pay Dr. Burrows spousal maintenance of $1,800 per month for 24 months. Based on her gross monthly income of $7,500, the court ordered DeGon to pay $1,797 per month in child support.

DeGon filed a "Motion for Reconsideration or in the Alternative for a New Trial or to Re-Open for Additional Testimony and Evidence." DeGon requested the court to reconsider the valuation and division of assets and liabilities, award of maintenance, order of child support, and allocation of expert fees. DeGon argued the court should reconsider imposition of the RCW 26.09.191(3) restrictions, allow additional weekends with the children, and provide joint decision-making through the case manager. In the alternative, DeGon asked the court to grant a new trial or reopen the trial to present additional evidence regarding Dr. Burrows' allegations of abuse because she did not have an opportunity to respond to the allegations at trial. DeGon submitted additional evidence including a number of declarations.

The court granted DeGon's motion for reconsideration in part. On November 3, the court entered extensive amended findings of fact and conclusions of law, a revised decree of dissolution after reconsideration, an amended final parenting plan, and an amended order of child support.

In the amended findings of fact and conclusions of law, the court deleted one of the findings DeGon objected to that related to an incident of abuse of Dr. Burrows. The court deleted the finding that DeGon committed "[a]cts constituting domestic violence"

as a basis for imposing restrictions under RCW 26.09.191(3). The amended findings state DeGon committed only "[a]cts of abuse" against Dr. Burrows.

The court also concluded that "an error was made in calculating both parties' income." The court found that "[g]iven Ms. DeGon's work history, education and experience," DeGon was "presently voluntarily under-employed, and understating her income." As a result, the court "conservative[ly]" imputed full-time income to DeGon of $8,800 per month plus "$900 per month, representing other sources of income which she has not documented." Based on a gross monthly income of $9,700, the court increased DeGon's monthly child support obligation to $1,947. The court also imputed a gross monthly income to Dr. Burrows of $6,666.

The court determined Dr. Burrows owed DeGon $3,475 for health insurance premiums she paid on his behalf between October 2013 and May 2014, but concluded Dr. Burrows was not required to reimburse DeGon for health insurance premiums paid between August and December of 2012. The court awarded the $50,000 home equity loan secured by the Edmonds residence to DeGon because she used the loan proceeds for her own expenses.

The court denied DeGon's request to change the parenting plan. The court concluded that "the residential time has been appropriately allocated between the parties and that no further changes to the Parenting Plan are necessary at this time." The court found that "there is substantial evidence in the record to support the imposition of [RCW 26.09].191 restrictions and to deny joint decision-making."

The court found the continuing restraining order was "in the best interests of the children and the parties, themselves, given the high degree of conflict," and "has been

tailored to allow Ms. DeGon to engage in school and extracurricular activities with the children, while minimizing the potential future conflict between the parties and protecting Dr. Burrows from future harassment or abuse."

The court rejected the argument that DeGon did not have a fair opportunity to respond to Dr. Burrows' allegations of abuse and denied the motion to reopen the trial to present additional evidence or a new trial. DeGon appeals.

ANALYSIS

DeGon challenges (1) the decision to designate Dr. Burrows as the residential parent with sole decision-making authority and the imposition of RCW 26.09.191(3) restrictions; (2) entry of the restraining order prohibiting her from having contact with Dr. Burrows and denial of her motion for reconsideration or to reopen to present additional evidence or for a new trial; (3) imputing income to her for the purpose of calculating child support; (4) awarding spousal maintenance; (5) characterizing the residence as a community asset, valuation of the AgileRecruiter software, denying her request for reimbursement of health insurance premiums; and (6) ordering her to pay for expert witnesses and other costs.

If the court's findings of fact are supported by substantial evidence in the record, we accept the findings as verities on appeal. In re Marriage of Thomas, 63 Wn. App. 658, 660, 821 P.2d 1227 (1991). Evidence is substantial when there is a sufficient quantum of evidence "to persuade a fair-minded person of the truth of the declared premise." In re Marriage of Burrill, 113 Wn. App. 863, 868, 56 P.3d 993 (2002). "So long as substantial evidence supports the finding, it does not matter that other evidence may contradict it." Burrill, 113 Wn. App. at 868. Unchallenged findings are also verities

on appeal. In re Marriage of Brewer, 137 Wn.2d 756, 766, 976 P.2d 102 (1999). This court does not review the trial court's credibility determinations, nor can it weigh conflicting evidence. In re Marriage of Meredith, 148 Wn. App. 887, 891 n.1, 201 P.3d 1056 (2009); In re Marriage of Rich, 80 Wn. App. 252, 259, 907 P.2d 1234 (1996).

1. Parenting Plan

We review parenting plan decisions for abuse of discretion. In re Marriage of Katare, 175 Wn.2d 23, 35, 283 P.3d 546 (2012). A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons. Katare, 175 Wn.2d at 35. Because of the trial court's unique opportunity to observe the parties, the appellate court is extremely reluctant to disturb a trial court's child placement decisions. In re Parentage of Schroeder, 106 Wn. App. 343, 349, 22 P.3d 1280 (2001).

The best interests of the child is the standard "by which the court determines and allocates the parties' parental responsibilities." RCW 26.09.002; Schroeder, 106 Wn. App. at 349. In establishing a residential schedule for children in a parenting plan, RCW 26.09.187(3)(a) identifies the following factors a trial court must consider:

> (i) The relative strength, nature, and stability of the child's relationship with each parent;
> (ii) The agreements of the parties, provided they were entered into knowingly and voluntarily;
> (iii) Each parent's past and potential for future performance of parenting functions . . . , including whether a parent has taken greater responsibility for performing parenting functions relating to the daily needs of the child;
> (iv) The emotional needs and developmental level of the child;
> (v) The child's relationship with siblings and with other significant adults, as well as the child's involvement with his or her physical surroundings, school, or other significant activities;

(vi) The wishes of the parents and the wishes of a child who is sufficiently mature to express reasoned and independent preferences as to his or her residential schedule; and

(vii) Each parent's employment schedule, and shall make accommodations consistent with those schedules.

RCW 26.09.187(3)(a) states, "The child's residential schedule shall be consistent with RCW 26.09.191." RCW 26.09.191(3) allows a court to impose restrictions in a parenting plan if the court finds a parent's involvement or conduct may have an adverse effect on the child's best interest and if any of the factors in RCW 26.09.191(3) are present.[2]

DeGon argues the trial court erred by designating Dr. Burrows as the residential parent with sole decision-making authority and imposing RCW 26.09.191(3) restrictions based on finding that she engaged in "[e]pisodes of child neglect."[3] We disagree.

Substantial evidence supports the court's decision to designate Dr. Burrows as the residential parent with sole decision-making authority and to impose restrictions under RCW 26.09.191(3). The record shows the court considered and weighed the

_____

[2] RCW 26.09.191(3) states:

A parent's involvement or conduct may have an adverse effect on the child's best interests, and the court may preclude or limit any provisions of the parenting plan, if any of the following factors exist:

(a) A parent's neglect or substantial nonperformance of parenting functions;

(b) A long-term emotional or physical impairment which interferes with the parent's performance of parenting functions as defined in RCW 26.09.004;

(c) A long-term impairment resulting from drug, alcohol, or other substance abuse that interferes with the performance of parenting functions;

(d) The absence or substantial impairment of emotional ties between the parent and the child;

(e) The abusive use of conflict by the parent which creates the danger of serious damage to the child's psychological development;

(f) A parent has withheld from the other parent access to the child for a protracted period without good cause; or

(g) Such other factors or conduct as the court expressly finds adverse to the best interests of the child.

[3] DeGon also makes several arguments based on the premise that the court found she committed acts of domestic violence. But the court did not impose limitations on DeGon's residential time under RCW 26.09.191(2)(a)(iii) based on a finding of domestic violence.

14

evidence in accordance with RCW 26.09.187(3)(a) and identified factors that adversely affected the best interests of the children under RCW 26.09.191(3).

The unchallenged findings establish Dr. Burrows is a "highly functioning person who is clearly capable of parenting his children" and has a "warm" and "lov[ing]" relationship with the children. The unchallenged findings state that "Dr. Burrows' symptoms are treatable and that he has voluntarily engaged in treatment." The court found Dr. Burrows has "remarkably good insight" into his need for mental health treatment and is "willing and able to take medications and continue engaging in necessary individual therapy with a mental health treatment provider to treat his symptoms." The court cites the report of Dr. Burrows' doctor that states Dr. Burrows "is presently stable and strong enough to begin full-time parenting of his children."

The evidence also shows Dr. Burrows is better able to address the emotional and developmental needs of the children. In addition, Dr. Burrows was at home with the children the majority of the time while DeGon worked "very long hours," "often returned long after the children were in bed[,] and left . . . early in the morning."

Substantial evidence supports the court's decision to impose restrictions under RCW 26.09.191(3). The parenting plan states, in pertinent part:

**2.2    Other Factors (RCW 26.09.191(3))**

> Both parties' involvement or conduct may have an adverse effect on the children's best interests because of the existence of the factors which follow:
>
> (1)    The abusive use of conflict by Both Parties;
> (2)    Episodes of child neglect by the Mother;
> (3)    Denying a parent access to the children by the Mother;
> (4)    Acts of abuse by the Mother against the Father; and

(5)     Derogatory statements by the Father about the
Mother that could lead to the alienation of affection.

The Findings of Fact supporting these factors are set forth in detail in the Amended Findings of Fact and Conclusions of Law after Reconsideration filed separately in this matter. Such Findings of Fact and Conclusions of Law are incorporated herein by this reference as if set forth in full. Based on said Findings of Fact, the Court concludes that restrictions should be set forth in Paragraph 3.10 pursuant to RCW 26.09.191(3).

. . . .

**3.10   Restrictions**

- A Continuing Restraining Order. A continuing restraining order is imposed by separate order of the court, restraining Alicia DeGon from having any contact with Christopher Burrows, except through the case manager.

- The Appointment of a Case Manager. The Court will appoint a Case Manager by separate order to serve as the sole method of communication between the parties.

- Mental Health Therapy - Ms. De[G]on. Ms. DeGon shall be actively engaged in mental health therapy with a licensed mental health practitioner as often as directed by that practitioner, to address: (1) the conditions presented by her diagnosed personality disorder; (2) eliminating future conflict in her interactions with Dr. Burrows; and (3) to improve her attentiveness to her children's needs. This therapy should include obtaining a consultation from a sexual addiction specialist as recommended by Dr. Mai[u]ro. Dr. Mai[u]ro's report shall be shared with the mental health practitioner.

- Mental Health Therapy - Burrows. The Father, Christopher Burrows, shall continue with his mental health treatment as prescribed by his licensed mental health practitioner, and shall continue to take all prescribed medications for his mental health conditions.

DeGon argues substantial evidence does not support the conclusion that she engaged in "[e]pisodes of child neglect." DeGon challenges the findings that she (1) "refused to seek mental health counseling for [J.B.] and [S.B.] after both have exhibited

16

serious psychological conditions;" (2) "tends to minimize the impact that [J.B.]'s abusive behavior has on his younger brother and sister, and has left them in his care placing them in danger;" (3) "failed to seek medical treatment for [J.B.] after he jumped from a ladder and seriously injured his leg and was in obvious pain;" and (4) "left the family home for a period of six months and abandoned her children, focusing on her own needs."[4]

The findings of fact describe the basis for the determination that DeGon engaged in a pattern of neglect toward her children. Finding of fact 2.19(k) states:

> As to other grounds for [RCW 26.09].191 restrictions, the evidence presented reveals that Ms. DeGon has engaged in a pattern of child neglect toward her children, which has taken various forms. The common theme in this neglect is that Ms. DeGon appears to minimize issues and fails to adequately care for their basic health needs. Most serious of these is the fact that she has refused to seek mental health counseling for [J.B.] and [S.B.] after both have exhibited serious psychological conditions — [J.B.]: cutting and manipulation/aggressiveness toward his siblings, obsession with the Slenderman character;[5] and [S.B]: suicidal ideations — requiring ongoing therapy. This refusal to obtain treatment has persisted even after the GAL recommended weekly therapy several times, stressing its importance. Other examples were presented at trial. Ms. DeGon tends to minimize the impact that [J.B.]'s abusive behavior has on his younger brother and sister, and has left them in his care placing them in danger. Dr. Burrows testified that he witnessed one such occasion over Skype[6] when he was in England, during which time he could see and hear the children fighting and crying out at the hands of [J.B.], and no other adults were present. Additionally, Ms. DeGon failed to seek medical

---

[4] DeGon also assigns error but does not present argument concerning other portions of finding of fact 2.19. Under RAP 10.3, an appellant must "present argument to the reviewing court as to why specific findings of fact are in error and to support those arguments with citation to relevant portions of the record." In re Disciplinary Proceeding Against Whitney, 155 Wn.2d 451, 466, 120 P.3d 550 (2005).

[5] The GAL report describes the "Slenderman" character as:

[A] mythical creature often depicted as a tall, thin figure wearing a black suit and a blank face. According to the legend, he can stretch or shorten his arms at will and has tentacle-like appendages protruding from his back. Depending on the interpretations of the myth, the creature can cause memory loss, insomnia, paranoia, coughing fits (nicknamed "slendersickness"), photograph/video distortions and can teleport at will. The urban legend has inspired fan arts, fictional creepypastas [(Internet horror stories)] and a mockumentary series in the style of the 1999 indie horror film Blair Witch Project.

[6] Skype is a live video chat and long-distance voice calling service.

treatment for [J.B.] after he jumped from a ladder and seriously injured his leg and was in obvious pain. Upon discovering this after school the next day, his father took him to the doctor and it was determined that the leg was fractured. Lastly, in 2010, Ms. DeGon left the family home for a period of six months and abandoned her children, focusing on her own needs, while Dr. Burrows was falling into a depression over the break-up of their relationship. The Court finds that the sum of these actions constitutes a pattern of child neglect for which restrictions in the parenting plan are warranted.

Substantial evidence supports the court's findings that DeGon engaged in a pattern of neglect toward the children. The GAL described the psychological conditions of J.B. and S.B. and testified that DeGon did not regularly take the children to therapy, but only "when there is a crisis." With respect to the finding that DeGon "tends to minimize" the impact of J.B.'s behavior toward his younger siblings, Dr. Burrows testified that while the children lived with DeGon, despite concerns regarding J.B.'s treatment of S.B., she moved J.B. and S.B. into the same bedroom. Dr. Burrows also testified that while on Skype with the children, he saw J.B. fighting with S.B. and the children were alone at home.

With regard to DeGon's failure to seek treatment for J.B.'s leg injury, Dr. Burrows testified that J.B. complained to DeGon after he injured his leg but DeGon did not seek medical treatment. Dr. Burrows stated that when he picked J.B. up the next day, J.B. "could barely walk" and he immediately took J.B. to the Everett Clinic.

A number of witnesses testified about the six-month period in 2010 when DeGon stayed with a friend in Belltown. Dr. Burrows testified that during this six-month period, DeGon only saw the children "some weekends."

18

DeGon claims the court abused its discretion by not following the recommendations of the GAL regarding the allocation of residential time.[7] We disagree.

The trial judge is "not bound by GAL recommendations." In re Marriage of Magnuson, 141 Wn. App. 347, 350-51, 170 P.3d 65 (2007); In re Marriage of Swanson, 88 Wn. App. 128, 138, 944 P.2d 6 (1997). The court "must make its own assessment of the child's best interests." Swanson, 88 Wn. App. at 138. The court is " 'free to ignore the guardian ad litem's recommendations if they are not supported by other evidence or it finds other testimony more convincing.' " In re Guardianship of Stamm, 121 Wn. App. 830, 836, 91 P.3d 126 (2004) (quoting Fernando v. Nieswandt, 87 Wn. App. 103, 107, 940 P.2d 1380 (1997)).

Substantial evidence supports the decision to designate Dr. Burrows as the residential parent with sole decision-making authority and impose restrictions under RCW 26.09.191(3).

## 2. Restraining Order and Motion for Reconsideration or To Reopen and New Trial

DeGon asserts the court violated her right to due process by entering a restraining order that prohibits her from having contact with Dr. Burrows and denying her motion for reconsideration or to reopen the trial to present additional evidence to rebut the allegations of abuse or for a new trial.

We review alleged due process violations de novo. In re Welfare of L.R., 180 Wn. App. 717, 723, 324 P.3d 737 (2014) (citing Post v. City of Tacoma, 167 Wn.2d 300, 308, 217 P.3d 1179 (2009)). We review a trial court's decision to deny a motion for a new trial for an abuse of discretion. Brundridge v. Fluor Fed. Servs., Inc., 164 Wn.2d

---

[7] DeGon's assertion that the court improperly restricted her residential time based on her "sexual preference" is not supported by the record. The record establishes the court allocated the residential time based on the best interests of the children.

432, 454, 191 P.3d 879 (2008). We review the decision to admit or exclude additional evidence on reconsideration for manifest abuse of discretion. In re Marriage of Tomsovic, 118 Wn. App. 96, 108, 74 P.3d 692 (2003); Cedar Grove Composting, Inc. v. City of Marysville, 188 Wn. App. 695, 728-29, 354 P.3d 249 (2015). A court may grant a motion for reconsideration or a new trial if the moving party presents new material evidence "which the party could not with reasonable diligence have discovered and produced at the trial." CR 59(a)(4). "However, evidence presented for the first time in a motion for reconsideration without a showing that the party could not have obtained the evidence earlier does not qualify as newly discovered evidence." Tomsovic, 118 Wn. App. at 109.

In her motion for reconsideration and to reopen the trial to present additional evidence or for a new trial, DeGon claimed she did not have a fair opportunity to respond to Dr. Burrows' allegations of physical and emotional abuse and child neglect and the court erred in entering a restraining order. In support of her motion, DeGon submitted declarations to show Dr. Burrows consented to the sexual activities he described at trial.

The amended findings following reconsideration squarely reject DeGon's arguments.

> Respondent alleges on reconsideration that the Court had no basis to impose [RCW 26.09].191 restrictions or a continuing restraining order against her. She now seeks to add new testimony and evidence into the record, or alternatively, a new trial, alleging that she did not have a fair opportunity to respond to Dr. Burrows' claims of physical and emotional abuse, harassment or neglect of the children. The trial in this matter lasted over a period of 10 court days. Dr. Burrows' claims were presented in his trial brief, during opening statements and closing arguments, and during direct testimony from Dr. Burrows himself, as well as his adult son, [D.B.] Information about his claims of abuse was also presented through

the testimony of the GAL and Dr. Mai[u]ro. Each of these witnesses was subject to cross-examination by Respondent's attorney. Ms. DeGon also testified after these allegations were made and called a witness on her own behalf. Ms. DeGon did not vigorously dispute or defend against these claims at trial. In fact, she sought to limit questions about this subject when her witness, Ms. Baker-Anderson was cross-examined. No request for a continuance was made to allow for more time to address these allegations. Accordingly, the Court finds that there is no basis to conclude that these allegations came as any surprise to Respondent, or that she did not have every opportunity to address them either on cross-examination, in her own case in chief, or during rebuttal. The Court finds that a separate, continuing restraining order which sets forth the parameters of limited contact between the parties is in the best interests of the children and the parties, themselves, given the high degree of conflict between them. The Court concludes that the order has been tailored to allow Ms. DeGon to engage in school and extracurricular activities with the children, while minimizing the potential future conflict between the parties and protecting Dr. Burrows from future harassment or abuse.

The record supports the court's findings and shows DeGon had notice and the opportunity to address allegations of abuse of Dr. Burrows, neglect of the children, and the request for a restraining order. Dr. Burrows' trial brief states he is seeking a restraining order: "Mr. Burrows . . . is also seeking . . . a lifetime protection or restraining order prohibiting Ms. DeGon from having any direct contact with him." In his trial brief, Dr. Burrows alleged DeGon "was emotionally, verbally and physically abusive toward" him. Dr. Burrows also alleged that although the couple "had engaged in consensual sexual fetishes during their relationship, . . . Ms. DeGon crossed the line and physically abused Mr. Burrows, ignoring his safe word and requests that she cease her behavior." Dr. Burrows, Dr. Maiuro, and others testified about the abuse of Dr. Burrows during the marriage. DeGon had a full opportunity to cross-examine. DeGon also testified and called witnesses on her behalf.

The court did not violate DeGon's right to due process or abuse its discretion by entering a restraining order that prohibits her from having any contact with Dr. Burrows

or by denying her motion on reconsideration to reopen the trial to present additional evidence or for a new trial.

## 3. Child Support

DeGon argues the court erred by imputing income to her for the purpose of calculating child support when there was no finding that she was purposely underemployed. Dr. Burrows contends a court is required to find that a parent is purposely underemployed only if the parent is gainfully employed on a full-time basis.

"A trial court's award of child support, including imputation of income for a voluntarily unemployed or underemployed parent, is reviewed for an abuse of discretion." In re Marriage of Shui, 132 Wn. App. 568, 588, 125 P.3d 180 (2005). Trial court decisions regarding child support "will seldom be changed on appeal;" the spouse who challenges such decisions must show the trial court manifestly abused its discretion. In re Marriage of Griffin, 114 Wn.2d 772, 776, 791 P.2d 519 (1990). "When calculating child support obligations, 'a court may consider all relevant factors, including current and future income.' " Shui, 132 Wn. App. at 588 (quoting In re Marriage of Payne, 82 Wn. App. 147, 152, 916 P.2d 968 (1996)).

RCW 26.19.071(6) governs imputing income for purposes of calculating child support. In re Marriage of Goodell, 130 Wn. App. 381, 389, 122 P.3d 929 (2005). RCW 26.19.071(6) states, in pertinent part:

> The court shall impute income to a parent when the parent is voluntarily unemployed or voluntarily underemployed. The court shall determine whether the parent is voluntarily underemployed or voluntarily unemployed based upon that parent's work history, education, health, and age, or any other relevant factors. A court shall not impute income to a parent who is gainfully employed on a full-time basis, unless the court finds that the

parent is voluntarily underemployed and finds that the parent is purposely underemployed to reduce the parent's child support obligation.[8]

Accordingly, RCW 26.19.071(6) requires a finding that a "parent is purposely underemployed to reduce the parent's child support obligation" only if a parent "is gainfully employed on a full-time basis."

The court found that DeGon was not employed on a full-time basis and "only works .80 FTE[9] (or 30 hours per week)." The evidence presented at trial supports this finding. DeGon's offer letter from Kaman Engineering Services states, "Your compensation will be adjusted to reflect an 80% FTE." DeGon also testified Kaman Engineering Services "didn't have enough work or budget to employ me full time, so they created a 32-hour week to give me flexibility to be a single parent but also to enable me to participate in their benefits program." The court did not abuse its discretion by imputing income to DeGon for the purpose of calculating the child support obligation.

4. Spousal Maintenance

DeGon argues the court erred in awarding spousal maintenance to Dr. Burrows without making a finding on the amount Dr. Burrows would receive in child support.

We review a trial court's award of maintenance for abuse of discretion. In re Marriage of Valente, 179 Wn. App. 817, 822, 320 P.3d 115 (2014). The trial court has wide discretion to make an award of maintenance. In re Marriage of Luckey, 73 Wn. App. 201, 209, 868 P.2d 189 (1994) (citing In re Marriage of Bulicek, 59 Wn. App. 630, 634, 800 P.2d 394 (1990)). The only limitation on the amount and duration of

---

[8] Emphasis added.

[9] Full-time equivalent.

maintenance under RCW 26.09.090 is that the award must be just. Luckey, 73 Wn. App. at 209. "We must presume that the court considered all evidence before it in fashioning the order." In re Marriage of Kelly, 85 Wn. App. 785, 793, 934 P.2d 1218 (1997).

Under RCW 26.09.090(1), the court may award maintenance "in such amounts and for such periods of time as the court deems just" after considering the following factors:

> (a) The financial resources of the party seeking maintenance, including separate or community property apportioned to him or her, and his or her ability to meet his or her needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party;
> (b) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find employment appropriate to his or her skill, interests, style of life, and other attendant circumstances;
> (c) The standard of living established during the marriage or domestic partnership;
> (d) The duration of the marriage or domestic partnership;
> (e) The age, physical and emotional condition, and financial obligations of the spouse or domestic partner seeking maintenance; and
> (f) The ability of the spouse or domestic partner from whom maintenance is sought to meet his or her needs and financial obligations while meeting those of the spouse or domestic partner seeking maintenance.[10]

RCW 26.09.090 does not require the trial court to make specific factual findings on each of the factors listed in RCW 26.09.090(1). In re Marriage of Mansour, 126 Wn. App. 1, 16, 106 P.3d 768 (2004). "[F]ailure to list the influence of each factor in its ruling" is not a basis for reversing the court's award of maintenance. Mansour, 126 Wn. App. at 16.

---

[10] Emphasis added.

24

Based on the factors set forth in RCW 26.09.090(1), the court concluded Dr. Burrows needed maintenance and DeGon had the ability to pay $1,800 per month for 24 months. The unchallenged findings support the award of maintenance.

5. Division of Property

DeGon challenges the court's division of property. DeGon argues the court erred in characterizing the Edmonds residence as a community asset, awarding her the $50,000 home equity loan, valuing the AgileRecruiter software, and not requiring Dr. Burrows to reimburse her for health insurance premiums paid between August and December of 2012.

We review the division of property for abuse of discretion. In re Marriage of Muhammad, 153 Wn.2d 795, 803, 108 P.3d 779 (2005). The trial court has "broad discretion in distributing the marital property" and its decision will be reversed only if exercised on untenable grounds or for untenable reasons. In re Marriage of Rockwell, 141 Wn. App. 235, 242-43, 170 P.3d 572 (2007). "The trial court is in the best position to assess the assets and liabilities of the parties" and to determine what constitutes an equitable outcome. Brewer, 137 Wn.2d at 769.

The trial court's objective when dividing property is to divide and distribute the parties' property in a manner that is "just and equitable." RCW 26.09.080. The statute requires the trial court to consider all relevant factors including, but not limited to:

(1) The nature and extent of the community property;
(2) The nature and extent of the separate property;
(3) The duration of the marriage . . . ; and

25

(4) The economic circumstances of each spouse . . . at the time the division of property is to become effective.

RCW 26.09.080. A just and equitable distribution does not mean the court must make an equal distribution. In re Marriage of DewBerry, 115 Wn. App. 351, 366, 62 P.3d 525 (2003).

Characterization of the Edmonds Residence

DeGon asserts that because the Edmonds residence "was purchased before marriage and the title was in DeGon's name only," the court erred in characterizing the Edmonds residence as community property.

The court's characterization of property as separate or community presents a mixed question of law and fact. We review factual findings supporting the characterization for substantial evidence. In re Marriage of Mueller, 140 Wn. App. 498, 503-04, 167 P.3d 568 (2007). The ultimate characterization of property as community or separate is a question of law we review de novo. Mueller, 140 Wn. App. at 503-04.

The court characterized the residence as a community asset. Finding of fact 2.8(a) states, in pertinent part:

> The Court finds that this asset is properly characterized as a community asset. The property was purchased with separate fund contributions of both spouses, one month prior to their marriage. Although both contributed separate funds to the purchase, title was put in the name of Alicia DeGon only. The evidence demonstrates that the parties intended to create a community asset, but were attempting to shield the property from claims from Dr. Burrow's [sic] ex-wife. This is further bolstered by the fact that Ms. DeGon later executed a Quitclaim Deed conveying title to the property to the Marital Community.

Substantial evidence supports the characterization of the residence as community property. Dr. Burrows testified that he contributed between $20,000 and $30,000 to the purchase of the residence. But Dr. Burrows and DeGon agreed title

26

would be in DeGon's name because he "was concerned that my wife, ex-wife, would seek to seize that asset . . . , and I didn't want . . . my new family to be exposed to that."

In December 2011, DeGon executed a quitclaim deed transferring the Edmonds residence to the marital community. The quitclaim deed transfers "all right, title, and interest" in the property to "Dr. Christopher Burrows [and] Alicia DeGon." The affidavit signed by Dr. Burrows and DeGon states the transaction was exempt from the real estate excise tax under WAC 458-61A-203(1) because the transaction was intended to "create community property."

A spouse may contractually agree to change the character of their separate property into community property. In re Estate of Shea, 60 Wn.2d 810, 816, 376 P.2d 147 (1962). A spouse may execute a quitclaim deed transferring the property to the community. In re Estate of Borghi, 167 Wn.2d 480, 488-89, 219 P.3d 932 (2009). A quitclaim deed passes all right, title, and interest that the grantor has at the time of executing the deed. Newport Yacht Basin Ass'n of Condo. Owners v. Supreme Nw., Inc., 168 Wn. App. 56, 67, 277 P.3d 18 (2012). The court properly characterized the residence as community property.

$50,000 Home Equity Loan

DeGon argues the court erred in awarding her the $50,000 home equity loan secured by the Edmonds residence.

The court found that "[o]n July 16, 2013, Ms. DeGon also took out a home equity loan on the parties' single family residence in the amount of $50,000 for her use and deposited the cash in her Bank of America Account ('Hip Moves' 8402)." DeGon does not dispute that she took out the home equity loan or that she deposited the cash into

27

her Bank of America account. The record shows the court awarded the Bank of America account ending in 8402 to DeGon. The court did not abuse its discretion by awarding the home equity loan to DeGon.

### Valuation of AgileRecruiter Software

DeGon asserts that the court erred in valuing the AgileRecruiter software at $80,000. She claims AgileRecruiter "has become obsolete technology" and the court should have valued it "at [the] cost of replacement for a reasonable amount of time."

We will not substitute our judgment for that of the trial court on the disputed factual issue of valuation. Worthington v. Worthington, 73 Wn.2d 759, 762, 440 P.2d 478 (1968). "[W]hen the parties offer conflicting evidence in valuation, the court may adopt the value asserted by either party or any value in between the two." Rockwell, 141 Wn. App. at 250.

In determining the value of the AgileRecruiter software, the court considered the value of the software by Solutions IQ when it purchased the program in 2007 as well as the testimony of Dr. Burrows and DeGon.

Dr. Burrows testified that Solutions IQ paid $10,000 per month for use of AgileRecruiter. Dr. Burrows testified that AgileRecruiter was worth between $0 and $10,000. DeGon testified that AgileRecruiter was worth about $1,000,000:

> Q.    What value do you believe would be reasonable value to put on AgileRecruiter, if you have one in mind?
> A.    Well, reflecting the value created by actual transactions over time, the sale of the company, the settlement of the company, and also the tax return performance in which I had the asset to use and what I was able to do with it, I think it is worth about $1 million.

28

The court valued AgileRecruiter at $80,000.

First, the Court looks to the transactions that took place between the parties and Solutions IQ for an indication of value. Solutions IQ was paying a fee of $10,000 per month for use of the program. Even assuming 50% of the value was in the database, which is probably low, that would amount to an annual value of $60,000. The database is usable beyond a single year. Accordingly, ascribing it a value of $80,000 is not unreasonable in light of the value placed on it by Solutions IQ.

Because the $80,000 valuation the court placed on the AgileRecruiter software is supported by the evidence, the court did not abuse its discretion by valuing the AgileRecruiter software at $80,000.

Health Insurance Premiums

DeGon contends the court erred in refusing to require Dr. Burrows to reimburse her for his share of the health insurance premiums that she paid between August and December 2012.

In the amended findings of fact and conclusions of law, the court found:

Based on the evidence presented, it is clear to the court that Dr. Burrows was not ordered to pay until January 1, 2013. Accordingly, back payments for the period of August through December 2012 are not appropriately awarded to Respondent.

Substantial evidence supports the court's finding. The December 21, 2012 decision states, "Father shall pay his own medical premium directly to the provider, starting 1/1/2013."[11]

6. Allocation of Costs of Experts, GAL Fees, and Other Court Costs

DeGon asserts the court erred in requiring her to pay the costs of experts, including the psychological evaluations and GAL fees, and other court costs. The

---

[11] Emphasis added.

29

decision to award fees under RCW 26.09.140 is discretionary and based on the needs of the spouse seeking fees and the ability of the other spouse to pay. In re Marriage of Moody, 137 Wn.2d 979, 994, 976 P.2d 1240 (1999).

The evidence shows DeGon was earning $90,000 per year working at Kaman Engineering Services. By contrast, Dr. Burrows may be unable to continue performing review work for NASA and should work only part-time due to his mental illness. The court's undisputed findings establish DeGon "had access to and utilized community assets to fund her own expenses and attorney's fees during these proceedings to a greater degree than Dr. Burrows," and the court awarded DeGon a $75,000 equalizing payment to help cover the expert costs.

Substantial evidence supports the finding that "in light of the financial positions of the parties, it is proper to award payment of costs of experts, psychological evaluations, GAL fees and other court costs to Ms. DeGon."

Both parties request attorney fees on appeal under RCW 26.09.140.[12] In her financial declaration, DeGon states her average monthly income over the last year was $8,375. In his financial declaration, Dr. Burrows states his average monthly income over the last year was $500.

Determining whether a fee award is appropriate under RCW 26.09.140 requires this court to consider the parties' relative ability to pay and the arguable merits of the issues raised on appeal. Muhammad, 153 Wn.2d at 807. Upon compliance with RAP

---

[12] RCW 26.09.140 provides, in pertinent part, "Upon any appeal, the appellate court may, in its discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorneys' fees in addition to statutory costs."

18.1, we award attorney fees to Dr. Burrows.

We affirm in all respects.

WE CONCUR:

Trickey, J